1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                       PORTLAND DIVISION

4
UNITED STATES OF AMERICA,        )
5                                )
                    Plaintiff,   )  Case No. 3:17-cr-00437-JO-1
6                                )
                 v.              )
7                                )  November 20, 2019
JUAN CARLOS RAMON,               )
8                                )
                    Defendant.   )  Portland, Oregon
9    _____)

10

11

12

13                       SENTENCING

14              TRANSCRIPT OF PROCEEDINGS

15        BEFORE THE HONORABLE ROBERT E. JONES

16     UNITED STATES DISTRICT COURT SENIOR JUDGE

17

18

19

20

21

22

23

24

25

```
 1                              APPEARANCES

 2   FOR THE PLAINTIFF:
                              NATALIE K. WIGHT
 3                            United States Attorney's Office
                              1000 SW Third Street
 4                            Suite 600
                              Portland, OR 97204
 5
     FOR THE DEFENDANT:
 6                            JAMES F. HALLEY
                              300 Oswego Pointe Dr.
 7                            Suite 101
                              Lake Oswego, OR  97034
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                        United States District Courthouse
23                      1000 SW Third Avenue, Room 301
                        Portland, OR 97204
24                      (503)326-8191

25                              *   *   *
```

1                                    INDEX

2    WITNESS:                                        PAGE:

3     KATHERINE GOTCH

4     Direct Examination                            8

5     Cross-Examination                            18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

(November 20, 2019)

(In open court:)

THE COURT:  Good morning, everybody.  Please be seated.

MR. HALLEY:  Good morning, Your Honor.

THE COURT:  Counsel?

MS. WIGHT:  Good morning, Your Honor.  Natalie Wight for the United States.  This is the case of United States v. Juan Carlos Ramon.  This is Case No. 3:17-cr-00437.

Mr. Ramon is here today.  He is in custody.  He is at counsel table with Mr. James Halley.  Your Honor, we are here today for a sentencing.

THE COURT:  Thank you.  Your position?

MS. WIGHT:  Your Honor, you've received the government's sentencing memorandum, but the government also realizes that you received an outpouring of support for Mr. Ramon, and in this particular case, Your Honor, the outpouring of support has been very impactful to the government.  Those letters were powerful.  But the one thing missing here today, Your Honor, is the voice of the victims in this case.  In fact, Your Honor didn't receive any letters from the victims.  In fact, the victims chose not to present any information.  The victims chose not to ask for restitution. Their voices aren't heard today, Your Honor.  This is it.

1        In this case, we can understand, when we have victims that

2    are six years old and eight years old, why they might want to

3    just put this all behind them, why their families may not want

4    to receive any money from Mr. Ramon.  I can understand that,

5    Your Honor.  But the government hopes that in the decisions

6    that the Court makes today, that you do consider the

7    seriousness of these offenses and the importance -- the heavy

8    weight of the mandatory minimum sentences that are already

9    attached to charges.  Multiple victims.  15 years is a very

10   long sentence, Your Honor.

11       And I do understand that even with the reductions already

12   made by the government and the low-end sentence we're asking

13   for of 262, that's an incredibly high sentence, Your Honor.

14   But we do ask that you consider the fact that this is not a

15   regular mandatory minimum sentence for production.  So,

16   perhaps, the Court will find that maybe it merits something

17   beyond the mandatory minimum.  We have lots of production

18   cases, Your Honor.  This one is a little unique.

19       I know we are going to hear today from Dr. Gotch.  Maybe

20   I'll have a few questions for her before the Court makes its

21   decision.

22           THE COURT:  Thank you.

23       Counsel?

24           MR. HALLEY:  Thank you, Your Honor.  I first would

25   like start by introducing to the Court people who have come on

1  Mr. Ramon's behalf -- all behind me.  If I can, I'll begin with

2  Robert Gott, who for 17 years has been --

3           THE COURT:  You'll have to speak into the microphone.

4           MR. HALLEY:  Oh, yes, Your Honor.  I didn't want to

5  stand in the way of the people, but let me sit.  First, to your

6  right, Your Honor, is Robert Gott, who for 17 years has been

7  the pastor at the Columbia County Jail.  Next to him is Jim

8  Mask, who's also served a pastor at the Columbia County Jail.

9  Next to Mr. Mask is Jonathan Pulvers, a longtime friend of

10 Mr. Ramon's.

11          THE COURT:  Raise your hand.

12          MR. HALLEY:  Next to Mr. Polvers is Maria Eloise

13 Robles, who's Mr. Ramon's aunt -- the sister of his mother.

14 Next to Ms. Robles is Cristobal Ramon, Mr. Ramon's father, and

15 then Berta Ramon, Mr. Ramon's mother.

16     Next to Berta Ramon is Chris Bateman, a school-age friend

17 of Mr. Ramon's.  Then Hailey Foster, who is Mr. Ramon's former

18 girlfriend, now married to somebody else, since the offense,

19 but remains a good friend and in regular contact with

20 Mr. Ramon.  And last is Sean Howell, who I think is up here

21 from California.

22     Your Honor has letters from all except for, I think,

23 Mr. Polvers and Mr. Gott.

24     In Mr. Got's case, I just -- if I could, he sent me an

25 email that outlined his efforts at the jail, and he said that

1  his honest belief is that -- and he mentions that he's been

2  doing this pastoring for 17 years -- is -- and has worked with

3  hundreds of people.  Mr. Ramon is a changed man.  You have

4  letters from all the others submitted with my confidential

5  sentencing letter and supplement.  We are going to urge the

6  Court to impose just the mandatory minimum, and I would like to

7  call Katherine Gotch to testify about the evaluation that she

8  did, the risk assessment that she did, because it is

9  informative as to whether or not there's any purpose in any

10  time beyond 180 months.  If I may do that?

11          THE COURT:  You may.

12          MR. HALLEY:  Thank you.

13      Would you please come forward, Ms. Gotch?

14          DEPUTY COURTROOM CLERK:  Just go around to the stand.

15

16                      KATHERINE GOTCH,

17  called as a witness on behalf of the Defendant, being first

18  duly sworn, is examined and testified as follows:

19

20          THE WITNESS:  I do.

21          THE COURT:  Good morning.

22          THE WITNESS:  Good morning.

23          DEPUTY COURTROOM CLERK:  Please be seated.  Could you

24  state your name and spell your name for the record, please.

25  Speak directly to the microphone.

Gotch - D

1        THE WITNESS:  Katherine Gotch.  K-a-t-h-e-r-i-n-e.

2   G-o-t-c-h.

3                    DIRECT EXAMINATION

4   BY MR. HALLEY:

5   Q.   Ms. Gotch, please describe your education for Judge Jones.

6   A.   I have a bachelor's degree in psychology from Boston

7   University and a master's degree in forensic psychology from

8   the University of Denver, and I've worked in the field of

9   sexual abuse prevention for almost 20 years; so 19 years.

10  Q.   All right.  And this morning did you hand to me a copy of

11  your current CV?

12  A.   I did.

13  Q.   Is that slightly different from the one that was -- that I

14  had had earlier?

15  A.   Yes.  The one you had --

16            THE COURT:  I have had -- she's qualified.

17            MR. HALLEY:  Oh, all right.

18            THE WITNESS:  There we go.

19  BY MR. HALLEY: (Continuing)

20  Q.   I just would like to just ask a little bit about your

21  experience and your background in that respect.

22        Can you tell the Court some of the agencies that you have

23  done work for in evaluating the risk of recidivism for sex

24  offenders?

25  A.   I began my work in Denver, when I was in graduate school

Gotch - D

1   and worked at a community-based treatment program for

2   individuals with sexual behavior problems and sexual

3   convictions, and then I worked at the Massachusetts Treatment

4   Center for sexually violent persons, which was a locked

5   facility, a civil commitment facility in Bridgewater,

6   Massachusetts, before leaving that position and coming to

7   Oregon in 2004, when I took a position with Multnomah County

8   Department of Community Justice.  I was their in-house clinical

9   expert on sexual offending and violence for parole and

10   probation.  And in that role I also became legislative --

11   involved in legislative and public policy work and have

12   continued being involved in public policy work for about 15

13   years now, both locally and nationally.

14      And I currently serve as the public policy representative

15   for the association for the treatment of sexual abusers on

16   their executive board, as well as on the board for the National

17   Partnership to End Interpersonal Violence.

18      I was with Multnomah County for eight years before that

19   position was cut, and I transitioned into private practice full

20   time.  I had already opened my private practice probably -- I

21   think it was '07 when I started doing contracted work for the

22   Oregon Board of Parole.  I was under their former predatory

23   designation system.  I was one of two predatory prerelease

24   evaluators for the Board of Parole.

25      After transitioning into private practice, I specialize in

Gotch - D

1   the assessment, evaluation, and treatment of individuals with
2   sexual and violent behavioral problems, both adjudicated and
3   non-adjudicated.
4        I currently serve in a large number of consultation roles.
5   I'm a certified Static-99R, STABLE- and ACUTE-2007 trainer.  I
6   have been in that role for ten years now, and I train all the
7   community corrections officers, the sexual offense-specific
8   parole and probation officers in the state of Oregon, as well
9   as provide those trainings nationally and, on occasion,
10  internationally and -- yeah.
11  Q.   One of the things I would like to ask you is have you
12  testified in court before?
13  A.   Yes, I have.
14  Q.   All right.  Would you please tell the Court what the
15  Static-99R is and what the STABLE-2007 is?
16  A.   So current practices within offense-specific management,
17  so for individuals who have arrests, charges, or convictions
18  for any kind of criminal activity, we are basing on the
19  concepts of risk, need, and responsivity.  Risk provides a
20  baseline level of an individual's risk, as demonstrated through
21  validated risk assessment tools.  Needs are the criminogenic
22  needs which are also identified as dynamic risk factors that
23  are changeable and can be targeted through meaningful
24  interventions.  And they're also assessed through empirically
25  validated instruments.  And then responsivity has to do with

Gotch - D

1   how we deliver services to an individual.

2       So when we look at sexual abuse-specific risk/need tools,

3   the Static-99R and the STABLE-2007 are examples of those tools.

4       The Static-99R is an actuarial risk assessment tool based

5   on primarily historical information; so someone's offense

6   history, victim types, those types of things.  And then the

7   STABLE-2007 is looking at empirically validated factors that

8   are what we would call criminogenic needs; so those dynamic

9   changeable factors that, when targeted through meaningful

10  interventions, they can be reduced.  And the Static and STABLE

11  are combined tools to provide a comprehensive risk/need

12  profile.

13  Q.   Can you tell the Court what you have done in Mr. Ramon's

14  case?

15  A.   In Mr. Ramon's case, I reviewed the collateral information

16  provided by your office, which is outlined in the report, and

17  I'm happy to go through that if needed.

18  Q.   I don't think you need to.

19  A.   It doesn't sound like it.

20  Q.   If it's in the report, it's in the report.

21  A.   I also completed a level of service case management

22  inventory, which is a general criminogenic risk/need

23  instrument.  So it provides information on Mr. Ramon's risk for

24  future general crimes.  So any kind of criminal offense.  I did

25  a Psychopathy Checklist Revised, which is looking at the

Gotch - D

1  construct of psychopathic traits, which, when present, is

2  related to increased recidivism risk for some populations, and

3  I also did a Static-99R and a STABLE-2007.

4  Q.   Do you have an opinion as to the risk of recidivism for

5  Mr. Ramon?

6  A.   Mr. Ramon's overall risk/need profile fell within the

7  average range.  So the Court may be more used to hearing the

8  terminology "low, moderate, and high," but in 2015, the Council

9  of State Governments, in conjunction with a number of

10 researchers and experts in the field of risk assessment,

11 created a five-level system that was identifying and linking an

12 individual's recidivism risk potential with the actual needs

13 that were present in that case.

14     So the five levels that were identified are above -- well

15 above average risk, which is your level fives for general

16 offenders; above average risk for level four; average risk,

17 which is level three; below average risk, which is level two;

18 and very low risk, which is level one.

19     And the reason of the movement towards that risk

20 communication was to assist courts in understanding what the

21 meaning of a risk tool actually was because someone could score

22 a high or be identified as high on one instrument and moderate

23 on another.

24     So the Static-99R and the STABLE-2007 are some of the

25 first instruments in the sexual abuse-specific arena that have

Gotch - D

1   incorporated that language.  And so what it translates to, as

2   identified in my report, is specifically what are the needs of

3   the individual, the risk that they prevent, the protective

4   factors that may be present for that individual, to help guide

5   management and interventions for that person.

6       So when we talk about Mr. Ramon falling within the average

7   risk category on the Static-99R and STABLE-2007, that

8   translates to he presents similarly to the average individual

9   convicted of a sexual crime.  And when we look at absolute

10  recidivism rates, that translates to approximately 92 out of

11  100 individuals with the same risk profile would not sexually

12  recidivate within five years of release into the community,

13  whereas eight would.

14  Q.   May I just ask some questions about or a question about

15  that absolute rate?  This is -- if you took a population of a

16  hundred people with the same characteristics of Mr. Ramon,

17  falling in the average category, correct --

18  A.   That's correct.

19  Q.   -- and observed them over the period of five years after

20  their release, eight of them, statistically, would be expected

21  to reoffend; is that correct?

22  A.   Yes.  Reoffend sexually.

23  Q.   Reoffend sexually?

24  A.   Yes.

25  Q.   And that is the risk that he has today?

Gotch - D

1    A.    That's correct.

2    Q.    As he sits here today.

3         Will his risk profile, risk measure, improve with time?

4    A.    So depending on the length of time that Mr. Ramon is

5    incarcerated, his Static score may reduce because one of the

6    items, the first item, is age at release.

7              THE COURT:  How old is he now?

8              MR. HALLEY:  34, Your Honor.

9              THE WITNESS:  And for individuals who are 18 to 34.99

10   years old.  They get one point for age.  If he is released

11   after age 35, his Static score reduces by one point.  And if he

12   is released after age 40, his Static reduces by two points.

13        However --

14             THE COURT:  Well, he won't get out for 15 years at

15   least; so compute that as talking about the risk once he's

16   released.  15 years plus 34 is.

17             THE WITNESS:  The way the Static-99R item age of

18   release is broken down, there's a risk reduction at age 35 and

19   then there's an additional risk reduction at age 40 and then

20   there's another risk reduction after age 60.  So unless he's

21   getting out -- yeah, there's a big jump there.  It actually

22   goes from one point, zero, negative one, negative three.  So if

23   someone is over the age of 60, it reduces by three points.  And

24   that's looking at their age at release.

25        But with regards to Mr. Ramon, the change in the Static

Gotch - D

1   score, when you look at the combined Static/STABLE

2   comprehensive risk/need profile, without adequately addressing

3   his identified criminogenic needs that are outlined in the

4   STABLE-2007, his actual overall risk/need profile would stay

5   the same.

6       That's why I emphasize a great deal in my report the

7   importance of him receiving interventions and having the

8   opportunity to participate in treatment programming.  Because

9   that is the meaningful part that will reduce his risk profile

10  over time.

11  BY MR. HALLEY: (Continuing)

12  Q.   Do you have an opinion or an impression regarding his

13  desire to make those changes?

14  A.   Mr. Ramon presented in an extremely open, straightforward,

15  and genuine manner during our interactions.  And for reference,

16  I specialized, when I was doing treatment, in working with your

17  higher risk, high violence, high level of psychopathic traits.

18  Pretty manipulative kind of individuals.  And Mr. Ramon was

19  extremely remorseful.  He exhibited an understanding of the

20  harm he caused, not only to the victims in this case, but also

21  to their families, to his family and support system, and to

22  society as a whole.

23  Q.   Based on that, do you view him as a good prospect for

24  improving on those criminogenic needs during a period of

25  treatment in custody?

Gotch - D

A.    Yes, I do.  I feel that even in his two years while in
Columbia County Jail that he has developed and recognized many
of his treatment needs and has demonstrated more understanding
of the motivations for his behavior, as well as how he could
have done this in the first place.

     And as noted in my report, his treatment amenability is
excellent.  He's very motivated to target and address his areas
of risk/need and to, in any way he can, make restoration for
the harm he has caused.

Q.    And then, lastly, I would like to ask if you could comment
on whether or not sentencing him to 262 months, as opposed to
180 months, changes anything in the prospects for his
rehabilitation.  In other words, does that extra time, the 62
months -- no, pardon me, 82 months, does that period of time
improve the prospects at all for his rehabilitation?

A.    Research has shown that incarceration does little for
rehabilitation or protection of society, other than removing an
individual from society.  And in my public policy work, much of
what I emphasize and focus on is intelligent, evidence-based,
public policy, and good use of our resources, and I recognize
we're working within a mandatory minimum situation with regards
to the charges that Mr. Ramon is facing -- excuse me, the
sentencing -- he's already been convicted -- of what he is
facing.

     And for community safety purposes, I do not think an

Gotch - D

1    extensive period of incarceration would do further to enhance

2    community safety above and beyond what is expected.

3    Q.    In other words, above and beyond what is achieved by a

4    sentence of 180 months?

5    A.    Whatever the mandatory minimum may be.

6          I noted in my report that if it was an option, Mr. Ramon

7    would be a very strong candidate for community-based

8    supervision and management, but that is not an option on the

9    table.  And that's based on his overall risk/need profile.  And

10   my emphasis on utilization of incarceration for those who

11   present serious community safety risk.  Those who fall within

12   your above-average to well-above-average risk profiles.

13   Q.    I think I have two more questions.

14         Over the course of your career, approximately how many

15   people have you evaluated?

16   A.    Oh, goodness.  We're in the many hundreds to potentially

17   thousand.  I have several doctoral students from Pacific

18   crunching data right now in my clinic, and I think even just

19   within the past few years we were in the hundreds, so --

20   Q.    And, lastly, you mentioned that you have testified before.

21   If you were to assign a percentage or proportion to the number

22   of times you've testified for the defense, as you are doing

23   here today, and for the prosecution, could you tell the Court

24   what that distribution is?

25   A.    I would say approximately, for testifying, is 60/40; 40

Gotch - X

1    for the defense and 60 for the government.

2              MR. HALLEY:  Thank you very much.  I don't have any

3    other questions, Your Honor.

4              MS. WIGHT:  Just very briefly, Your Honor.

5              THE COURT:  Yes.

6

7                        CROSS-EXAMINATION

8    BY MS. WIGHT:

9    Q.   Ms. Gotch, your focus, you mentioned, is on treatment and

10   assessment of the sex offender, the sex abuser; is that

11   correct?

12   A.   That is correct.

13   Q.   And so your research and practice doesn't focus on victim

14   treatment; is that correct?

15   A.   Actually, my whole work focuses on prevention of sexual

16   abuse.  And I collaborate very strongly with victim advocacy

17   organizations and work very closely with them as well as

18   survivor organizations.

19   Q.   Is any of your research focused on the harm caused to

20   victims?  Are any of your papers or research focused in that

21   area?

22   A.   My own?

23   Q.   Yes.

24   A.   Not my own research.  My own research has been on

25   management and treatment and risk assessment.

Gotch - X

1   Q.   Of the abuser?

2   A.   Of individuals convicted or accused of sexual crimes, yes.

3   Q.   And you're here today because you do know that for the

4   government's recommendation and for the Court's sentence, that

5   we do need to consider the risk to community following the

6   sentence?

7   A.   And that is part of why I discuss -- it's not just

8   treatment.  It's management that I'm also looking at and

9   management needs and community safety and effective use of

10  resources for enhancement of community safety.

11  Q.   I just want to talk to you real quickly about treatment

12  and then rehabilitation.  You mentioned to the Court that

13  you're concerned that any sort of incarceration -- I think you

14  said does little for rehabilitation.  And so in this particular

15  case, you reviewed a lot of documents before; is that correct?

16  A.   Yes.

17  Q.   And then one of the documents you did review was the Abel

18  Assessment of sexual interest?

19  A.   Yes.

20  Q.   And that is one of the documents, obviously, to the

21  government, causes a lot of concern.  And can you tell the

22  Court what the Abel Assessment for sexual interest is?

23  A.   The Abel Assessment of sexual interest is an objective

24  assessment of an individual's sexual interest patterns.

25  Q.   And in this case, Ms. Gotch, I think it was Dr. Brewer --

Gotch - X

1        Is that correct?

2    A.    That's correct.

3    Q.    -- provided a list ranking Mr. Ramon's sexual interest in

4    different groups?

5    A.    That's correct.

6    Q.    And the number one list -- group on that list was grade

7    school females?

8    A.    I actually have to state that that was a mistake with

9    regards to ranking most significant to least significant.  I

10   just spoke with Bret White from the Abel Assessment

11   Institute -- what?  Last week?  No.  The week before.  At the

12   Atlanta ATSA Conference.  And what that list is is not his

13   highest to his lowest.  It's all the areas he showed sexual

14   interest in.

15        So, yes, there was sexual interest, but it's

16   inappropriately listed as rank ordered in that fashion.

17   Because the way Dr. White explained it to me was that there's

18   no way to identify which is the highest.  It's just whether the

19   sexual interest is present or not.

20   Q.    So then you're telling me the report that was provided to

21   the Court is incorrect?

22   A.    I'm stating that my pullout from Dr. Brewer has that one

23   most significant to least significant was incorrect in how it

24   was articulated, and that is a mistake that I recently

25   corrected by talking with Dr. White from the Abel Institute a

Gotch - X

1  week or so ago.

2  Q.    But didn't provide anything to the Court in this case

3  correcting that?

4  A.    No.  Because I wasn't aware I needed to until I was

5  reviewing and I noticed that.  And that was pulled directly

6  from Dr. Brewer's report, and I'll be communicating with

7  Dr. Brewer.  Because there's been conversation in the treatment

8  community recently about how to report out the Abel data, and

9  that's one of the reasons why I spoke with Dr. White a week or

10 so ago.

11 Q.    So then the ranking that lists grade school females and

12 preschool females as his top ranking sexual interest, you're

13 saying is not true?

14 A.    What I'm saying is that Mr. Ramon demonstrated sexual

15 interest in all of those listed; so he does have inappropriate

16 sexual interest to prepubescent children.  I'm not saying that

17 that is not correct.  I'm saying that identifying grade school

18 age as his top is incorrect.  He just has sexual interest in

19 all of those groups that were listed.

20 Q.    Thank you, Ms. Gotch.

21       Then as far as rehabilitation, we then agree he does have

22 an interest in very young girls.  Can you tell us, since we're

23 very concerned about risk to the community afterwards, while

24 he's in prison, how are they going to address his sexual

25 interest in grade school and preschool-aged girls?  How will

Gotch - X

1   that be rehabilitated in the next 15 years, at least?

2   A.    My understanding is that there are treatment -- sexual

3   abuse-specific treatment programs available within the federal

4   penitentiary system and that if those programs are up to date

5   on evidence-based practices, they would be incorporating

6   arousal reconditioning as part of that for individuals who

7   struggle.

8              THE COURT:  Are you familiar with Lompoc.

9              THE WITNESS:  So-so familiar with Lompoc.

10  BY MS. WIGHT: (Continuing)

11  Q.    Are you familiar with any of the other BOP sex offender

12  treatment programs?

13  A.    Not specifically.

14  Q.    So as far as Mr. Ramon's concerned, you do not know what

15  sort of treatment he will be getting in the BOP?

16  A.    I do not know.  I made recommendations regarding what

17  treatment would effectively reduce his recidivism risk.

18             THE COURT:  When you talk about treatment -- I've

19  been at this a long time.  And we've gone from over almost 60

20  years ago, to Dr. Ruth Gens (phonetic) chemical castration,

21  through penile plethysmograph in the state hospital.  And so

22  what is available in a penitentiary system as far as, quote,

23  "treatment"?  What does it consist of?

24             THE WITNESS:  Specifically, in the federal system?

25             THE COURT:  Yes.

Gotch - X

1          THE WITNESS:  I do not work for the federal

2    government, and I'm not --

3          THE COURT:  Well, in any penal system.

4          THE WITNESS:  Well, in any?  I can tell you that

5    based on current research, which is much more robust and

6    different than we had even 30 years ago, with regards to the

7    effectiveness of treatment interventions, programs that adhere

8    to the risk/need responsivity model and utilize empirically

9    based interventions for individuals convicted of sexual crimes

10   have -- there's a recent meta-analysis that just came out in

11   2019, and it has shown a reduction of about a third with

12   regards to recidivism.

13         THE COURT:  What do they do?  What do they do?

14         THE WITNESS:  So what they do -- all right.  So when

15   we look at treatment, we are looking at meaningful

16   interventions on empirically validated criminogenic needs.  So

17   the STABLE-2007 is an instrument that's an example of one that

18   targets the research-based criminogenic needs.  So there are

19   five domains on the STABLE:  Significant social influences,

20   intimacy deficits, general self-regulation, sexual

21   self-regulation, and cooperation with supervision.

22         Underneath those.  So significant social influences has to

23   do with who you spend time with.  Do you have pro-social or

24   negative social peers?  So individuals who have pro-social

25   support networks, that is -- also could be identified of what's

Gotch - X

1   called a protective factor.  So something that, when it's in

2   place, it actually helps reduce an individual's risk for

3   recidivism.

4        So in Mr. Ramon's case, he has a very robust pro social

5   network.  That's a good thing.

6        Intimacy deficits looks at capacity for relationship

7   stability, emotional identification with children, lack of

8   concern for others, general social rejection, loneliness and

9   hostility towards women.  All five of those factors have been

10  shown to demonstrate, if present, they increase an individual's

11  risk for recidivism.

12       I can go through all of those items, if you'd like,

13  Your Honor, or I can continue on to the next section.

14            THE COURT:  I don't -- I just wanted to know is this

15  done with a therapist individually or is it group meetings or

16  is there any -- what -- what is done?

17            THE WITNESS:  What is done?

18            THE COURT:  Yeah.

19            THE WITNESS:  So in community-based treatment, it's

20  typically a combination of both group and individual.

21            THE COURT:  Not community.

22            THE WITNESS:  I know.  I'm going to get there.

23            THE COURT:  We're there.

24            THE WITNESS:  I know we're there.

25            THE COURT:  While in prison, what's he going to do as

Gotch - X

1  far as treatment?  That's a question.

2          THE WITNESS:  Well, ideally, what he would do would

3  be similar to what goes on in the community with group and/or

4  individual treatment targeting his identified risk/need factors

5  as outlined within the risk/need tools.

6          THE COURT:  Okay.

7          THE WITNESS:  So I am aware that they do implement

8  and have programs in the federal institutions that do utilize

9  some risk assessment tools to help guide all of that.

10          THE COURT:  We have had very positive responses from,

11  as I mentioned, Lompoc, where they have -- they have therapists

12  there --

13          THE WITNESS:  Yes.

14          THE COURT:  -- that work with individuals.

15          THE WITNESS:  If that was your question, yes, it

16  needs to be someone who is licensed, trained.  They need to

17  have advanced mental health degrees.  Whether it's, you know, a

18  masters or --

19          THE COURT:  That was my question.

20          THE WITNESS:  Sorry.  I apologize for

21  misunderstanding it.

22          MS. WIGHT:  Just one last question, Your Honor.

23          THE COURT:  All right.

24  BY MS. WIGHT: (Continuing)

25  Q.   Ending on something positive that Mr. Ramon has submitted

Gotch - X

1  since his arrest, I want to talk to you a little bit about the

2  change in deceptive practices and change in deception by a

3  defendant following arrest.

4      As the Court knows, in this case, we received a dozen

5  letters from family and friends, and everybody was shocked that

6  Mr. Ramon actually had this dark secret.  That is not always

7  the case.  So my question to you is has the change in his

8  forthrightness, his honesty, in these meetings that you have

9  had with him, how has that been affected since this arrest --

10  since this prosecution?  Do you see this as positively

11  affecting his ability to communicate honestly?

12  A.   I do.  And Mr. Ramon also exhibited that or verbalized

13  that during our interactions.  He mentioned being -- and it's

14  even quoted in my report that he's, you know, scared to death,

15  but he also recognizes how important this was for him to even

16  have an understanding of the negative impact and how

17  disconnected he was from himself.

18      I think an important piece is Mr. Ramon was exposed to

19  this type of similar behavior when he was 10, and it normalized

20  it and created a normal pattern for this behavior over time and

21  entrenched it in a way that facilitated and allowed him, this

22  individual who is a pro-social, very active member of his

23  community, with a long, you know, history of a strong intimate

24  relationship, a great career, to engage in these kind of

25  behaviors due to this almost disconnection and lack of

1    understanding of his own personality and integration.  And

2    since arrest, he's been able to accept and address and tackle

3    those things and recognize his depression, his anxiety, and

4    start to meaningfully target that in order to integrate himself

5    together, to move forward in a positive manner for everyone.

6    Not only for himself but for society as well.

7              MS. WIGHT:  Thank you, Ms. Gotch.

8         Your Honor, the government does believe that Mr. Ramon's

9    response has been exceptional as far as acceptance of

10   responsibility in this case.

11             THE COURT:  Thank you.

12             MS. WIGHT:  Thanks.

13             THE COURT:  Would he like to make a statement?

14             MR. HALLEY:  He would, Your Honor.  I just want to

15   briefly touch on some points before he does, if I may?

16             THE COURT:  Oh, sure.

17             MR. HALLEY:  The prosecution doesn't dispute the

18   exceptional nature of Mr. Ramon's acceptance.  It began at the

19   moment he was arrested, and it's continued to this day, and it

20   is something that everybody behind me has been able to

21   appreciate and evaluate.  Some who have long experience --

22        Oh, thank you, Ms. Gotch.

23        -- a long experience with people in custody and have the

24   awareness of when someone is being insincere.  In that respect,

25   I would just touch on Mr. Mask's letter, submitted yesterday

1   with my supplemental letter, where he said, "It is my belief

2   that Juan underwent a dynamic life change and actually wants to

3   lead a different life than the one of a child sexual offender."

4        I want to reiterate my argument made in my papers about

5   the lack of an empirical basis for the guideline base offense

6   level.

7             THE COURT:  You don't have to do that.

8             MR. HALLEY:  All right.  I just rely on the *Henderson*

9   case in that respect.

10       I would like to point out that the offense in this

11  instance was generated, in part, by a period of depression.

12  Mr. Ramon has suffered from depression and anxiety throughout

13  his life.  And that is something he now can seek treatment for

14  but had not done so in the past.  And --

15            THE COURT:  But he's got his master's degree.

16            MR. HALLEY:  Yes.

17            THE COURT:  And he's been a school -- what?  What did

18  he -- what had he done with it?

19            MR. HALLEY:  He was teaching.  And then the -- most

20  recently, before the offense, if I understand correctly, he

21  changed jobs to work with Catholic schools in administering

22  programs.  His responsibilities grew, and that led to a period

23  of intense anxiety and led to the --

24            THE COURT:  I am talking about what he did.  Was he a

25  counselor?

1        MR. HALLEY:  No.  It's my understanding that what he

2   did was he developed programs for students.  Is that correct?

3        THE DEFENDANT:  (Nodding.)

4        THE COURT:  Okay.

5        MR. HALLEY:  So --

6        THE COURT:  I blocked you.

7        MR. HALLEY:  You -- sort of.

8   The other distinction I would like to touch on is he did

9   not touch any children.  I think that's a significant

10  distinction between others who have committed this offense and

11  have been subject to the same guideline and warrants a

12  variance.

13      And so, taking all of those things into account, taking

14  into account the fact that -- looking at many years in prison,

15  he's likely to be subject to abuse in isolation.  The time will

16  be particularly hard.  I'd rely on the case *United States v.*

17  *Leland A* (phonetic) 2019 LEXIS 63514, just a 2019 case for that

18  proposal, and also that he -- he's more likely to recover more

19  readily with a lesser sentence, as I think Ms. Gotch said and

20  was noted *United States v. Arroyo*, 312 F.Supp.3d 347.

21        THE COURT:  That's okay.  I don't need the citation,

22  especially to Fed Supps.  I --

23        MR. HALLEY:  Here's the point --

24        THE COURT:  I just want you to tell me is that

25  what -- I'm not interested in what some other judge at the

1    non-appeals level said.  I'm more interested in talking about

2    what is -- what's going on with him and what his future is.

3         So as I understand it --

4              MR. HALLEY:  If I --

5              THE COURT:  -- he has done -- he knows what he did

6    was despicable; right?

7              MR. HALLEY:  Right.

8              THE DEFENDANT:  (Nodding.)

9              THE COURT:  And he knows that it was damaging.

10              MR. HALLEY:  Right.

11              THE COURT:  Probably hurt these children and many

12    others who may have seen this sort of thing, and he understands

13    that; right?

14              MR. HALLEY:  He certainly does, Your Honor, and he

15    does wish to address the Court.

16              THE COURT:  And I want to hear from him.

17              MR. HALLEY:  All right.

18              THE COURT:  Thank you.  I've got your arguments.

19              THE DEFENDANT:  First, I want to apologize with all

20    my heart and soul for my actions.  The words "I'm sorry" do not

21    begin to cover the depth of my guilt, sadness, and shame.  I

22    have acted in a reprehensible and disgusting manner and have

23    brought pain and suffering to those that I was supposed to

24    protect.  There are no excuses for what I have done.

25         Since my arrest in November of 2017, I have taken every

available class, completed every program possible, and made
every effort to receive treatment and rehabilitate myself to
the best of my ability.  In doing so, I have come face to face
with my inner demons, acknowledged my transgressions, and felt
the full weight of their consequences.  I've ruined all I had
worked for.  What haunts me the most, though, is the knowledge
of the hurt I have caused and in the very group I --

            THE COURT:  I can't -- we can't --

            THE DEFENDANT:  Okay.  What haunts me the most,
though, is the knowledge of the hurt I have caused to the very
group I had dedicated my life to helping.  I'm so sorry I
failed them.

        To the family and individuals I have hurt, I'm so, so,
sorry for everything I have done and for the damage I have
caused.  There's no excuse or trauma great enough to explain
away the things I have done to you and the people you love.  I
hope that you're able to find closure and peace through this
and that you're able to move forward with your lives.  Please
know that I'm doing everything in my power to ensure this
doesn't happen to anyone else.

        To Judge Jones and to Ms. Wight, I'm so sorry that my
actions have brought me before you today, that I have hurt
others and become a burden to my community.  I never wanted
this for myself or my family, and I'm making every effort to
come out of this a far better person.

1    Please know and believe that for those who are truly

2 interested and motivated, this experience can be one of

3 rehabilitation and can wholeheart -- and can be wholeheartedly

4 correctional.  It is immensely difficult, painful,

5 embarrassing, and, at times, seemingly hopeless.

6    For me, though, there's no other path forward.  Without

7 this intervention, I'm not sure I would have begun the process

8 of lifting myself up from the depths of depression, repression,

9 shame, and guilt.

10    Rather than viewing this as time wasted or lost, I have

11 used it as motivation to become the person I should have been a

12 long time ago.

13    To my family and friends and loved ones, I'm so sorry I

14 let you down.  I miss you all so much.  I promise I will make

15 every effort to get better and to be better and to come back

16 home.  I love you all.

17    This is a message to anyone else who might be doing the

18 same sort of behavior.  Please seek help and find a way to stop

19 what you're doing before it's too late.  Every minute you spend

20 in seeking images of this nature is a minute wasted, a minute

21 spent reducing the innocent to mere objects and the innocent --

22 ensuring their pain and suffering.  I know what it's like to

23 feel alone, hopeless, afraid, but I know you can change.  You

24 can get better.  You can have peace.

25    Serious transgressions require equally serious efforts to

1  change, and I won't stop working to be better.  I hope and pray

2  that you see me not as a monster, incapable of redemption, and

3  as a broken person, seeking to be better and made whole in

4  everything he does, and I will forever carry the burden of

5  knowing how deeply I have sinned and will use it as motivation

6  to be the best self -- be my best self every minute of every

7  day.

8       I beg you to please have mercy on me.

9            THE COURT:  Thank you.

10           THE DEFENDANT:  Thank you.

11           THE COURT:  Please stand.

12      In respect to this matter, normally, too often, when we

13  have a mandatory minimum, it is impediment rather than -- to

14  the Court, as opposed to being a standard.  In this case, the

15  mandatory minimum is well justified for the acts that were

16  done.  As I stated, they are despicable acts and that your

17  conduct for your education and background was extreme.

18      Now we turn the page.  You have done everything possible

19  for a human being to do to straighten up your life.  You had

20  support from every -- and I would say one of the most

21  impressive presentations I have incurred -- observed, that

22  everybody is wishing you well.

23      So your sentence will be -- there's no point in sentencing

24  you to more than 15 years, but it will be 15 years, followed by

25  a lifetime of supervised release.  You will register as a sex

offender.  You will follow all of the current issues that you

have taken issue with that are not going to change what the

recommendation is.  15 years from now, there will be more

changes in the world, and some of these -- at that time, at the

time of his release, some other judge will be able to evaluate

what would be appropriate for continued conditions, but I am

imposing those that are listed.

    There will be the usual $100 per count assessment.

Forfeiture of the computers and so forth.

    Yes, sir?

        MR. HALLEY:  May we ask for a recommendation to

Englewood, Colorado?  The Bureau of Prisons does have nine

facilities around the country, to my understanding, that

administer a sex offender treatment program, and that's the

nearest one on the West Coast that is in an FCI.

        THE COURT:  Yeah.

        MR. HALLEY:  To my understanding.

    There's a USP in Tucson, which would be closer to the

family, but I -- I don't know if he's appropriate for USP.

        THE COURT:  The Colorado institution is fine.  I'll

recommend it.

        MR. HALLEY:  Thank you, Your Honor.

        THE COURT:  Of course, you did go over the

presentence report, and you've all -- all of your excellent

work for his background.

 1          MR. HALLEY:  Thank you, Your Honor.

 2          THE COURT:  And I also appreciate the government's

 3  position; that this was a terrible crime, but he has made a

 4  remarkable step so far.

 5      There will be no appeal.

 6          MR. HALLEY:  I don't anticipate any, Your Honor, no.

 7  The Court has done what we have asked.

 8          THE COURT:  Thank you.  Anything further for the

 9  government?

10          MS. WIGHT:  Yes, Your Honor.  You have a final order

11  of forfeiture in front of you.

12          THE COURT:  Excuse me?

13          MS. WIGHT:  We provided a final order of forfeiture

14  in front of you.

15          THE COURT:  Yes.  I signed it.

16          MS. WIGHT:  And that there will be no restitution.

17          THE COURT:  Yes.  Thank you.

18          MR. HALLEY:  Thank you very much, Your Honor.

19          DEPUTY COURTROOM CLERK:  And these are to be served

20  concurrently?

21          THE COURT:  What?

22          DEPUTY COURTROOM CLERK:  Fifteen years for each count

23  and concurrent?

24          THE COURT:  Yes.  Yes.

25          MS. WIGHT:  Thank you, Your Honor.

1           MR. HALLEY:   Thank you.

2                        (Hearing concluded.)

1               C E R T I F I C A T E

2

3          United States of America v. Juan Carlos Ramon

4                       3:17-cr-00437-JO-1

5                          Sentencing

6                       November 20, 2019

7

8          I certify, by signing below, that the foregoing is a

9     true and correct transcript of the record, taken by

10    stenographic means, of the proceedings in the above-entitled

11    cause.  A transcript without an original signature, conformed

12    signature, or digitally signed signature is not certified.

13

14    /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
      _____
15
      Official Court Reporter        Signature Date: 12/23/2020
16    Oregon CSR No. 98-0346          CSR Expiration Date: 9/30/2023

17

18

19

20

21

22

23

24

25